The document below is hereby signed.

Signed: February 27, 2009.



_S. Martin Teel Jr._
S. Martin Teel, Jr.
United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| In re | ) | |
| | ) | |
| PAMELA S. ZOOK, | ) | Case No. 05-00083 |
| | ) | (Chapter 7) |
| Debtor. | ) | |
| _____ | ) | |
| | ) | |
| PAMELA S. ZOOK, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | Adversary Proceeding No. |
| EDFINANCIAL CORP., _et al._, | ) | 05-10019 |
| | ) | Not for Publication in |
| Defendants. | ) | West's Bankruptcy Reporter |

<u>MEMORANDUM DECISION</u>

The plaintiff, Pamela S. Zook, filed a complaint seeking to
have her student loan debts discharged.  This decision,
constituting the court's findings of fact and conclusions of law,
concludes that Zook is entitled to have the debts discharged.
Zook has proceeded in good faith to attempt to pay her student
loan debts, but due to a medical condition beyond her control she
is and will be unable to pay them if she is to address her

medical condition appropriately and to maintain a minimal

standard of living.  Zook suffers from a severe bipolar affective

disorder that interferes with her capacity to function at work

and otherwise, and that leads to periodic severe episodes of

depression during which she is essentially unable to function at

all.  This leaves her unable to earn an income at a level that

will permit her to maintain a minimal standard of living and make

payments on the student loan debt.  Accordingly, as discussed in

greater detail below, the debts are dischargeable pursuant to 11

U.S.C. § 523(a)(8) as imposing an undue hardship on Zook.

I

Student loan debts of the types involved in this case are

nondischargeable "unless excepting such debt from discharge

. . . would impose an undue hardship on the debtor and the

debtor's dependents."  11 U.S.C. § 523(a)(8).  The majority of

courts, including this one, have adopted some form of the "undue

hardship" standard as defined in *Brunner v. New York State Higher

Educ. Servs. Corp.*, 831 F.2d 395, 396 (2d Cir. 1987).[1]  To prove

an undue hardship, the *Brunner* standard requires that a debtor

---

[1]  *See Educ. Credit Mgmt. Corp. v. Polleys*, 356 F.3d 1302,
1309 (10th Cir. 2004); *In re Saxman,* 325 F.3d 1168, 1173 (9th
Cir. 2003); *In re Cox*, 338 F.3d 1238, 1241 (11th Cir. 2003); *In
re Gerhardt*, 348 F.3d 89, 91 (5th Cir. 2003); *Goulet v. Educ.
Credit Mgmt. Corp.*, 284 F.3d 773, 777 (7th Cir. 2002); *In re
Brightful*, 267 F.3d 324, 327 (3d Cir. 2001).  *See also In re
Hornsby*, 144 F.3d 433, 437 (6th Cir. 1998) (recognizing the
significance of the *Brunner* factors, but also considering any
other factors deemed relevant in a particular case).

show three things:

> (1) that the debtor cannot maintain, based on current
> income and expenses, a "minimal" standard of living for
> herself and her dependents if forced to repay the
> loans; (2) that additional circumstances exist
> indicating that this state of affairs is likely to
> persist for a significant portion of the repayment
> period of the student loans; and (3) that the debtor
> has made good faith efforts to repay the loans.

*Brunner*, 831 F.2d at 396.  I agree with *In re Polleys*, 356 F.3d

at 1309, that "the good faith portion of the *Brunner* test should

consider whether the debtor is acting in good faith in seeking

the discharge, or whether he is intentionally creating his

hardship."  A court must find in favor of the debtor on all three

inquiries to discharge the education loan.  *Brunner*, 831 F.2d at

396.

The other notable "undue hardship" standard is the totality-

of-the-circumstances standard, which has been adopted by the

United States Court of Appeals for the Eight Circuit.  *In re

Long*, 322 F.3d 549 (8th Cir. 2003).[2]  *Accord, In re Andresen*, 232

B.R. 127, 140 (B.A.P. 8th Cir. 1999).  I conclude that the

*Brunner* test generally sets forth the more appropriate test for

reasons discussed in *In re Polleys*, 356 F.3d at 1308-09.  I will

apply the *Brunner* test, but there are no facts or circumstances

---

[2] Under that standard, a court considers: "(1) the debtor's
past, present, and reasonably reliable future financial
resources; (2) a calculation of the debtor's and her dependent's
reasonable necessary living expenses; and (3) any other relevant
facts and circumstances surrounding each particular bankruptcy
case."  *In re Long*, 322 F.3d at 554 (internal citations omitted).

3

that would alter the outcome under the "totality-of-the-circumstances" test.  Under either test, Zook has established that the debts here are dischargeable.

As I have opined in the past, there are three qualifications to the *Brunner* test.  None of those qualifications alter the outcome here.

First, *Brunner* is not an all-or-nothing proposition.  If the debtor will have the ability to pay part of the debt in the future, applying the *Brunner* test to that part of the debt ought to make it nondischargeable.

Second, if the debtor is currently unable to pay the debt and the *Brunner* test is otherwise met except that the debtor has shown a future inability to pay for only a finite period, the debt ought to be dischargeable during that finite period.  In other words, if a debtor fails only the second *Brunner* requirement because after the passage of a finite period of time he likely will be able to pay the debt, he should not be discharged from the loan *in toto* because future prospects indicate he may be able to repay it later; in such a case, a deferral of payment (a temporary discharge of the debt) is the appropriate remedy.

Finally, limiting the forecast of the debtor's inability to pay to "a significant portion of the repayment period of the student loans," as mandated by *Brunner*, is obsolete.  The current

4

version of § 523(a)(8) makes no provision for a student loan debt
to become dischargeable, without a showing of undue hardship,
after the passage of a set number of years.  The version of
§ 523(a)(8) that applied in *Brunner* made the student loans
dischargeable after five years (without a showing of undue
hardship), and it is that five-year period that *Brunner* must have
had in mind.  *See In re Polleys*, 356 F.3d at 1307 n.2.  It makes
no sense, for example, that if the remaining repayment term for a
student loan is only one year, the debt can escape discharge even
though the record demonstrates that in three years the debtor
will have the ability to pay the entire debt.  Indeed, *Brunner*
itself recognized that the forecast of future inability to pay
should be over an extended period of time.  *See In re Brunner*,
831 F.2d at 396 ("Requiring evidence not only of current
inability to pay but also of additional, exceptional
circumstances, strongly suggestive of continuing inability to
repay over an extended period of time, more reliably guarantees
that the hardship presented is 'undue.'").  I agree with *In re
Polleys* that "the inquiry into future circumstances should be
limited to the foreseeable future" (which equates to the extended
period of time that *Brunner* envisioned), but I disagree with its
observation, in dicta, that the foreseeable future should be "at
most over the term of the loan."  *In re Polleys*, 356 F.3d at 1310
(citation omitted).

II

Starting in 1989, Zook attended the University of Texas to study for an undergraduate degree.  In her sophomore year, Zook withdrew from the university while suffering from an onset of severe depression, and had to be cared for by her father.  Four years later, she re-enrolled at the University of Texas and completed her undergraduate degree in 1997.  During 1998 to 2000, she took pre-med courses at the same university.

In August 1994, she took out her first student loan to finance her education at the University of Texas.  She took out additional student loans in 1995 and 1999 for that purpose.

Beyond the student loans incurred in attending the University of Texas that Zook seeks to discharge, Zook incurred additional student loan debts in attending medical school.  Zook was admitted to Georgetown University School of Medicine and began attending that school in the fall of 2001.  She took out the remaining student loans at issue here in 2001 and 2002 to finance that education.

During her first semester in medical school, she took a leave of absence due to her depression.  She began anew in 2002, but each semester she failed one-third of her courses and was unable to successfully stay in medical school due to recurring periods of depression.  During a portion of that period, Zook was homeless because she was unable to sustain employment in her

depressive state.

### III

As established by the testimony of Dr. Todd S. Cox, who
testified as an expert and also as Zook's treating physician,
Zook suffers from bipolar affective disorder.  Zook suffers from
a severity of the disease that is rare.  This disorder manifests
itself in a variety of ways, including changes in mood, in energy
and motivation, in sleep and appetite, and in self-image and
processing one's environment.  She suffers from a lack of self-
worth, due in part to her inability to complete her medical
education.  The student loan debts hanging over her head are a
reminder of that inability.

Zook's depressive state manifests itself in a complete lack
of motivation and energy, an inability to focus, and a feeling of
intense hopelessness.  During periods of severe depression, Zook
struggles with even basic functioning and is unable to fulfill
day-to-day activities.  During the last such episode, her
depression was severe and required full-time hospitalization.  At
one point she suffered an episode during which she received
electroshock therapy, a treatment that is reserved for the most
severe cases.  Zook requires an array of prescription medications
to address her disease (and the services of a prescribing
physician), but because the disease is not curable, she requires
psychotherapy as an additional necessary component of treating

her disease.

Her depressive episodes are particularly difficult for Zook because Zook lacks a support network of family or close friends who could assist her in functioning through her depressive periods. As a result, Zook is unable to maintain any aspect of her life during these periods, and must start her professional and personal life over after each episode, and her recuperative phase after such an episode takes longer than for a patient with greater supports.

At the time of the trial, Zook was currently in a recovery period from a depressive episode that lasted about a year and a half. Zook's bipolar condition cannot be cured; her treatment is an attempt to educate her on how to better manage her condition and avoid triggers in her life which will increase the likelihood or severity of a depressive episode. Zook's primary triggers include her failure in medical school, her loans (which are tied to her failure in medical school), and her fear that she will become homeless again when she has another depressive episode and is unable to work. Her inability to afford the full extent of the treatment she needs due to her financial condition similarly leads to stress that can be a trigger for severe episodes of depression.

Although it is impossible to predict the future for any given patient, based upon statistics of patients suffering from a

bipolar disorder, it is highly likely and almost guaranteed that Zook will have future episodes of severe depression. As Zook gets older, her condition will become more severe, and thus depressive episodes will be more frequent and more severe, and the periods of time during which she will be well will be shorter.

Even in her current condition (of recovering from and not being in the midst of a severe depressive episode), Zook is unable to function in a normal way. She is unable to cook for herself other than spaghetti, TV dinners, and microwaved foods, adding to her at-home and at-work food expenses. Her medications cause her fatigue; she suffers from extreme concentration difficulties; and her memory and word finding abilities are impaired.

Her ability to stay in jobs in the past has been miserable. For example, she failed as a bookseller at a retail book store, and she failed as a telephone receptionist at another company. She performs poorly in her current position: she acknowledges that she has difficulty following directions, she often tunes out, and she gets yelled at. Because of her illness, she occasionally misses work and has a lot of unpaid leave. Given her lack of capacity to function at a high level, it is amazing that she is still employed.

Zook's disease makes it difficult for her to develop friendships, to develop relationships, and to live with others. For days and weeks on end she often has a feeling of a need to stay at home and not venture out.

In addition to bipolar affective disorder, Zook also suffers from Ehlers-Danlos Syndrome (a genetic, connective tissue disorder), asthma, and allergies.  When she suffers sinus infections, that can worsen her ability to cope with her bipolar affective disorder.

IV

As previously stated, under the *Brunner* standard, a debtor must show that (1) he or she cannot maintain a "minimal" standard of living if forced to pay the education loans; (2) additional circumstances exist such that for an extended period of time he or she will be unable to repay the loans in the future; and, (3) he or she has made good faith efforts to repay the loans.  *See Polleys*, 356 F.3d at 1309-10; *Brunner*, 831 F.2d at 396.

A.

MAINTENANCE OF A "MINIMAL" STANDARD OF LIVING

The first *Brunner* inquiry is whether the debtor currently lacks the financial means and ability to repay the education debt while maintaining a minimal standard of living for him or herself.  *See Polleys*, 356 F.3d at 1309-10; *Brunner*, 831 F.2d at 396.  This inquiry requires consideration of the amount of the

10

debtor's education loan payments; the debtor's current income;
and household, medical, and other expenses, and the
reasonableness of those expenses.  The debtor need not live in
poverty in order to satisfy the first inquiry, but neither is the
debtor sheltered from making some personal and financial
sacrifices in order to repay the debt.  *See, e.g., In re Howe*,
319 B.R. 886, 889-90 (B.A.P. 9th Cir. 2005); *In re Faish*, 72 F.3d
298, 305 (3d Cir. 1995); *In re Kelly*, 351 B.R. 45, 53 (Bankr.
E.D.N.Y. 2006).  Put another way, "a minimal standard of living
is a measure of comfort, supported by a level of income,
sufficient to pay the costs of specific items recognized by both
subjective and objective criteria as basic necessities."  *Ivory
v. United States (In re Ivory)*, 269 B.R. 890, 899 (Bankr. N.D.
Ala. 2001).

The defendants are Texas Guaranteed Student Loan Corp.
("TGSLC") and Educational Credit Management Corporation ("ECMC")
(collectively, "Defendants").  Zook owes TGSLC $27,595.65 as of
January 17, 2006, as debt she incurred prior to medical school.
(Trial Exhibit M, p. 4.)  Zook owes ECMC $44,861.19 as of October
3, 2006, as debt incurred during medical school.  (Defendants'
Post Trial Memorandum, DE No. 49, p. 3.)  At the April 23, 2007
trial, Zook testified that she owed approximately $76,000 total
(the sum of the TGSLC and ECMC debts).  At an interest rate of

11

7.14% per annum,[3] a $76,000 debt would increase by $5,426.40 the first year, and would continue to increase.

Zook's gross salary in 2007, up to and including the date of trial (April 23, 2007), was $60,486.48 annually, or $5040.54 per month. (Direct Deposit Advice Slip, dated March 26, 2007, Trial Exhibit O.) This equates to a monthly net income of $3,469.62. (*Id.*) Zook had been receiving approximately $860 per month in Social Security disability benefits, but she received correspondence from the Social Security Administration that she would no longer receive that money because she had maintained employment for a fifteen month period.

In 2006, Zook earned $54,219 salary from employment, and received $7,902 in social security benefits. (Form 1040, U.S. Individual Income Tax Return – 2006, Trial Exhibit N.) But in previous years, Zook's employment was sporadic. Zook reported gross income of $11,893 in 2004; -$11.00 in 2003; $715 in 2002; $29,337.00 in 2001; and, $15,710 in 2000. (Zook's Response to Interrogatories, Trial Exhibit K, p. 8.) Zook's reported gross income for 2005 was not put into evidence. But in 2005, Zook earned monthly gross income of only $960 as a technical writer until July 11, 2005. She was unemployed from July 11, 2005 to

---

[3] Defendants represented that the ECMC interest rate was 7.14% per annum, but did not expressly provide the interest rate for the TGSLC debt. (*See* DE No. 49, pp. 2-3.) For the present calculations, the 7.14% rate will be used for both loans.

November 2005, and became unemployed again in December 2005.

The amount of Zook's total monthly expenses are in dispute.
At the trial, Zook quantified the following monthly expenses:

| | |
|---|---:|
| Rent: | $1,187 |
| Electricity: | 75 |
| Therapy sessions with Dr. Todd Cox: | 280 |
| Groceries, laundry, eating in restaurants: | 600 |
| Medications and supplements | 400 |
| Cellular telephone service | 35 |
| Cable television, internet, and home telephone service | 140 |
| Automobile insurance | 120 |
| Renter's insurance | 30 |
| Entertainment expenses | 50 |
| Cat food | 10 |
| Gasoline | 150 |
| Clothing | 150 |
| Total Monthly Expenses: | $3,227 |

Defendants have put forth a considerably lower estimate of
$2,432. (DE No. 49, p. 5.) Upon review, it is clear that
Defendants' lower estimate understates or does not include
several necessary expenses.

First, Defendants do not include the $280 per month for
therapy sessions with Dr. Cox. Zook testified that she sees Dr.

Cox twice a month, and Dr. Cox charges $200 per hour, with
insurance covering only $60 per hour.   Zook did not make clear
how long each session with Dr. Cox lasts, but assuming that each
session is only an hour, two meetings a month would cost Zook
$280.   Due to her severe bipolar disorder, the cost for therapy
is a necessary expense for even a minimal standard of living.

Second, Defendants afforded only $35.00 (in medicare and
insurance co-payments) for Zook's *prescription* medications.   (DE
No. 5, p. 5.)   However, Zook testified she also takes numerous
non-prescription medications, as well as vitamin and herbal
supplements.   Zook testified these supplements were taken to
attempt to reverse some of the memory loss Zook suffered from
electroshock therapy, given as treatment for her depression; and,
for Ehlers-Danlos Syndrome.   Zook's efforts to recover and
preserve her health constitute necessary expenses.

Third, Defendants listed Zook's entertainment expenses as
$35 (DE No. 49, p. 5), although they elicited from Zook an
estimate of $50 during her testimony.   Zook had testified that
she spent $15 per month for Netflix (a home-delivery movie
service), and purchased three crossword puzzle books and one
other book per month, at approximately $15 per book.   That
itemization would result in $75 per month, although I have used
the more conservative and very reasonable estimate of $50 in its
calculation above, as Zook agreed to that estimate during her

14

testimony.

Fourth, Defendants listed no expenses for clothing (*see* DE
No. 49, p. 5).  A minimal standard of living requires possession
of decent clothing and footwear, which will need to be replaced
from time to time.  *See In re Douglas*, 366 B.R. 241, 253 (Bankr.
M.D. Ga. 2007) (citing *In re Ivory*, 269 B.R. at 899).  This
expense includes clothing and footwear for both work and non-work
settings, and $150 per month is not an unreasonable amount with
which to procure those items.

Based upon these omissions and overly low estimations, I
reject Defendants' estimate of $2,432.

The list above, enumerating the expenses quantified by Zook
at trial and resulting in a monthly budget of $3,227, would yield
a monthly surplus of $242.62 (*i.e.*, $3,469.62 in income minus
$3,227 in expenses).  However, the $3,227 budget neglects to
include several additional expenses, which Zook discussed during
her testimony but was unable to precisely quantify.  Upon
considering those additional expenses, as below, no surplus
remains, and Zook's income is inadequate to cover her expenses.

First, Zook's therapy costs are understated.  Zook has
already tightened her budget by seeing Dr. Cox only twice a
month, rather than seeing him once a week, as she had done
previously.  Zook testified this was not due to any change in her
condition, but rather because she was unable to afford visiting

15

Dr. Cox once a week.  Were she to visit him once a week as she had previously, costing an additional $280 per month, the monthly surplus would already be exhausted.  Furthermore, Zook testified favorably of her work with an occupational therapist, who also served as a life coach.  However, she ceased her visits with her occupational therapist due to financial limitations.  Due to the seriousness of her bipolar disorder and the severity of damage that a period of depression causes, these medical expenses are properly considered a part of a minimal standard of living for Zook.

Second, in addition to bipolar affective disorder, Zook also suffers from Ehlers-Danlos Syndrome, asthma, and allergies.  Zook testified that she sees an allergist and an ear, nose, and throat specialist; however, there is no budgeting for any routine or emergency visits.

Zook reserves $125 per month, pre-tax, from her salary for medical expenses and places it in a MedFlex account.  (*See* Trial Exhibit O.)  This $125 per month is not calculated in her net monthly income of $3,469.62.  However, that amount does little to displace Zook's budgeted $680 of medical services, medicines, and supplements, or the additional expenses described above.  Indeed, the $125 would not pay for an hour of therapy from Dr. Cox.

Third, Zook owns a 1998 Toyota Camry.  Zook testified that the car requires $2,000 to $2,500 in repairs to its electrical

16

system; $200 to $250 to replace a headlight cover; and, an additional amount to refit the right side mirror.  Zook testified, based upon her home and work locations, she is unable to take public transit to work.  Any maintenance required on the automobile is a necessary expense, and would quickly consume in excess of her budgetary surplus under the $3,227 budget.

Fourth, Zook should be afforded some budgetary leeway to save funds for emergencies.  Other courts have recognized the appropriateness of inclusion of a reasonable amount for emergency spending.  *See, e.g., In re Douglas*, 366 B.R. at 254 (recognizing a lack of budgeting for emergency expenses was a factor that indicated debtor's budget was "extremely limited and bare.").  In Zook's case, such a fund is particularly warranted.  Zook has no credit cards and no stable network of support from family or close friends.  If she were to lose her job and were unable to secure employment that included health insurance, her medical bills would increase drastically (her $400 monthly estimate for medications and supplement would increase to at least $1,200 without health insurance and medicare).  A minimal standard of living should provide some continuity, and Zook should not be rendered homeless or precluded from necessary medical care or prescriptions should she have a break in employment.  This risk of unemployment is more than a mere possibility.  The severity of Zook's bipolar disorder will increase as she ages, and a relapse

17

of her depressive state at some point is, statistically, almost guaranteed.  Moreover, Zook's disease impairs her ability to function well at work even when she is not suffering an episode of severe depression, and it is quite surprising that she has been able to hold onto her current employment as long as she has.

Defendants point to Zook's savings of $5,000 as evidence she was not maintaining a minimal standard of living, arguing she was saving up to $400 per month.  A majority of those savings would be consumed due to Zook's owing approximately $2,000 in federal income tax from 2005 and 2006, and owing over $2,500 for oral surgery she required due to a congenital condition.  Such expenses provide a clear example why Zook should be permitted some ability to save for unexpected or unbudgeted expenses.

In arguing that Zook ought not be allowed to save, Defendants cite *Nash v. Conn. Student Loan Found. (In re Nash)*, 446 F.3d 188, 194 (1st Cir. 2006); *Paul v. Suffolk Univ. (In re Paul)*, 337 B.R. 730, 737 (Bankr. D. Mass. 2006); and *Pennsylvania Higher Educ. Assistance Agency v. Faish (In re Faish)*, 72 F.3d 298, 307 (3d Cir. 1995).  But as Defendants acknowledge, a debtor need only show that expenses are reasonably necessary, citing *In re Savage*, 311 B.R. 835, 841 (B.A.P. 1st Cir. 2004), and *In re Webb*, 262 B.R. 685 (Bankr. E.D. Tex. 2001).  Zook has shown that her savings *are* both reasonable and necessary to maintain a reserve to meet practically inevitable hard times

18

in the future.

Defendants also point to two categories of what they consider expenditure on luxury items that they contend demonstrate that Zook has an ability to make some repayment of her debts. They criticize, first, her expenditure of $600 per month on food. Defendants cite *In re Mandala*, 310 B.R. 213, 218 (Bankr. D. Kan. 2004), in support of this criticism, but that decision is distinguishable. As noted previously, that high expenditure is necessitated in part by Zook's inability to cope with the basic life skill of preparing her own meals from scratch, and part of that expense is not for groceries at home but for lunch at work. Moreover, as discussed later in regard to both this and the second category of expenditures that Defendants criticize, merely establishing that the level of a particular expenditure exceeds what a frugal individual would spend does not alone carry the day for Defendants.

Defendants criticize, second, Zook's telephone, cable and entertainment expenditures as being at a high level. In support of this argument, Defendants cite *In re Miller*, 377 F.3d 616, 623-24 (6th Cir. 2004); *Mandala v. Educ. Credit Mgmt. Corp.*, 310 B.R. 213 (D. Kan. 2004); *Commonwealth of Virginia State Educ. Assistance Auth. v. Dillon*, 189 B.R. 382 (Bankr. W.D. Va. 1995); *In re Wardlow*, 167 B.R. 148, 151 (Bankr. W.D. Mo. 1993); *In re Hornsby*, 242 B.R. 647, 652-53 (Bankr. W.D. Tenn. 1999); *In re*

19

*East*, 270 B.R. 485, 494 (Bankr. E.D. Cal. 2001); *Educ. Credit*

*Mgmt. Corp. v. Buchanan*, 276 B.R. 744, 751-52 (N.D. W. Va. 2002);

*In re Pincus*, 280 B.R. 303, 317-18 (Bankr. S.D.N.Y. 2002); and *In*

*re Perkins*, 318 B.R. 300, 309 (Bankr. M.D.N.C. 2004).  But those

decisions are distinguishable as discussed below.

As noted above, Zook spends $50 per month on miscellaneous

entertainment and she spends $35 on cellular telephone service

and $140 on cable television, internet, and home telephone

service.  A debtor is entitled under the minimal standard of

living test to incur some modicum of expenditures on telephone

and entertainment.  *See McLaney v. Ky. Higher Educ. Assistance*

*Auth. (In re McLaney)*, 375 B.R. 666, 674 (M.D. Ala. 2007) ("Even

under the minimal standard of living test, '[p]eople must have

the ability to pay for some small diversion or source of

recreation, even if it is just watching television or keeping a

pet.'" (quoting *In re Ivory*, 269 B.R. at 899)).  Given Zook's

mental disease, which makes it difficult for her to venture out

from her apartment, and her inability to readily socialize, this

level of expenditures on these types of items is not

unreasonable.[4]  It is noted, moreover, that by being a secluded

individual, Zook minimizes or eliminates amounts she might

---

[4]  Similarly, Zook's level of expenditure on rent is
justified by her medical condition which would make it difficult
for her to minimize that expense by sharing an apartment with
someone else.  Defendants have not challenged that expenditure
which consumes a large portion of Zook's income.

otherwise spend on such things as dinner out, movie theaters, or discretionary driving.

Even if these expenditures (on food, telephone, cable, and entertainment), at this level, and viewed in isolation, were not necessary to maintain a minimal standard of living, Zook's overall expenditures are at a level consistent with maintaining a minimal standard of living. In other words, these expenditures, even if viewed as unreasonably high, represent amounts that should be devoted to other expenses that *are* necessities and that are not being met: a higher level of medical care, and a reserve for practically inevitable future hard times. Zook deprives herself of meeting her necessities if she is indeed failing to act frugally by not reducing her expenditures on food and entertainment to a lower level (and by not eliminating some of them, like cable). As observed in *In re McLaney*, 375 B.R. at 676, "as a court examines a debtor's expense budget as a whole, it is appropriate for a court to take into account reasonably necessary items that are omitted, thereby creating, in the words of the bankruptcy court, 'an austere and even understated expense budget.'" (Citations omitted.) Given Zook's lack of capacity to function well in life, it is not surprising that she may not be a paradigm of frugality.

The decisions Defendants cite in support of their criticism of the level of Zook's expenditures on food and on telephone,

cable, and entertainment are distinguishable.  The debtors in
those cases were not failing to attain an income sufficient to
meet the level of expenditures required (1) appropriately to
address unique needs arising from the debtor's suffering from a
severe, incurable, and chronic medical condition and (2) to meet
as well other expenditures necessary to maintain a minimal
standard of living.  This, then, is like such cases as *In re
Douglas*, 366 B.R. at 253-54 ("Debtor's other necessary expenses
still exceed her income by several hundred dollars even without
the inclusion of the cable television and modem service
expense.").

By the Defendants' logic, a debtor living well below the
poverty level would be denied a discharge if the debtor, by
foregoing a reasonable level of expenditure on clothing, spent
part of his income on what would be considered luxury items, for
example, cable or going out to dinner.  A debtor whose income is
insufficient to meet a minimal standard of living, taking into
account the level of expenditures necessary for that purpose,
ought not be denied a discharge of student loan debts based on
the creditor's finding some item of expenditure that could be
deemed a non-necessity.  The *Brunner* test ought not be turned in
that fashion into a game of "gotcha" based on viewing certain
expenditures in isolation, wearing blinders that disregard the
debtor's needs in a global fashion.

22

Based upon Zook's budget, her monthly income of $3,469.62 and $125 monthly pre-tax medical flex account savings is inadequate to pay for her basic month-to-month necessities, including necessary health care, medications, and supplements, and does not permit her the opportunity to save funds to meet another necessity--setting aside a reserve to weather the high likelihood of future periods of depression, and loss of income, caused by her bipolar disorder.  As such, Zook lacks the ability to maintain a minimal standard of living if she were also required to repay her education loans.

B.

FUTURE ABILITY TO PAY

The next inquiry is whether there are any additional circumstances that indicate the debtor will not be able to make such payments in the foreseeable future.  *See Polleys*, 356 F.3d at 1310; *Brunner*, 831 F.2d at 396.  This requires consideration of any additional circumstances which will persist, or are likely to arise, which would prevent the debtor from securing adequate shelter, nutrition, health care, and similar necessities. *Polleys*, 356 F.3d at 1310.

Here, Zook suffers from a severe bipolar affective disorder, which will only become more difficult to manage as she ages. Although Zook made approximately $55,000 in 2006 and received a $5,000 raise in 2007, Zook's work history, coupled with

23

consideration of her condition, indicates her current salary is unlikely to continue. *See Barrett v. Educ. Credit Mgmt. Corp.*, 487 F.3d 353, 360 (6th Cir. 2007) (citing *In re Cheesman*, 25 F.3d 356, 360 (6th Cir. 1994)) ("[A] debtor's work history is a relevant and significant consideration in projecting whether a debtor's current state of affairs is likely to persist.")

Zook's previous employment, or lack thereof, yielded income as follows: $11,893 in 2004; -$11.00 in 2003; $715 in 2002; $29,337.00 in 2001; and, $15,710 in 2000. (Trial Exhibit K, p. 8). None of these years even approach her 2007 salary of approximately $60,000.

The pattern in Zook's income history is explained by the state at any given time of her bipolar affective disorder. Zook's disorder is characterized by periods of significant to moderate effectiveness, followed by periods of depression in which Zook is unable to care for herself. This fluctuation is evident in Zook's income history.

According to Dr. Cox, although Zook can develop some ability to manage her condition, the very nature of her condition indicates it will become more difficult to manage as she ages and will involve relapses into depressive states. Although a general risk of future unemployment does not negate a future ability to pay, here there is a specific risk of future unemployment. Dr. Cox's testimony and Zook's history of inconsistent employment and

24

fluctuating periods of functionality convincingly demonstrate
that Zook's current finances will not substantially improve in
the foreseeable future, and that there is a specific risk of
periodic unemployment due to her bipolar condition.  This all
indicates her finances will in all likelihood be drastically less
favorable from time to time.[5]

Defendants urge that Zook can pay currently and through the
foreseeable future if she were compelled to enroll in the Income
Contingent Repayment Program ("ICRP"), and specifically under the
ICRP option of making a monthly payment for 25 years of "20% of
the borrower's discretionary income, which is defined as the
borrower's adjusted gross income minus the poverty level for the
borrower's family size."  (Defendants' Ex. M at p. 2. *See also*
Federal Student Aid - Repayment Plans, at
www.ed.gov/offices/OSFAP/DirectLoan/RepayCalc/dlindex2.html).

Enrollment in the ICRP is not a viable option for Zook.  The
ICRP calculation for discretionary income ignores Zook's very
considerable medical bills, and thus would over-calculate Zook's
disposable income (her income available after meeting necessary
expenses), and thus would overstate the amount she would be able
to pay.

---

[5]  Zook repeatedly testified that she was likely to be
terminated at her place of employment in the near future, due to
her self-assessed, poor performance.  In light of Zook's medical
conditions and work history, that testimony is quite credible.

Even if the ICRP could provide Zook with a payment plan that would require a nominal monthly payment, compelling Zook to do so here would result in nothing but pointless hardship. As previously noted, Zook's debt of approximately $76,000, at an interest rate of 7.14%, generates $5,426.40 in interest in the first year. Zook would need to pay approximately $450 per month to only pay the yearly interest of the loan. Zook's nominal payment through ICRP would have no chance of ever decreasing the loan's principal; indeed, as interest compounds each year, Zook would spend the next 25 years (after which the loan is forgiven under the ICRP) watching her debt increase, despite her payments.

These payments of futility in the face of ever-growing debt would have very serious psychological and financial consequences for Zook. Zook would have a significant stressor to face in her ongoing struggle with severe bipolar affective disorder; should the stressor result in or prolong a depressive episode, Zook will lose work hours or her employment altogether in coping with that episode. Any ICRP payments would come from Zook's attempts to save for the next depressive period, or would force her to forgo more of the therapy or counseling she requires to better manage her condition. With continuously growing debt, Zook would also be unable to secure any credit in the future, could not save for retirement, and would have no opportunity to make a fresh start. *See In re Jesperson*, 2007 WL 1113803, *8-9 (Bankr. D. Minn. Apr.

26

16, 2007) (recognizing that requiring a repayment scheme that could never reach the principal would condemn the debtor to a life of poor credit and a cash-only lifestyle, characterizing the situation as being "sentenced to 25 years in a debtors' prison without walls").

In light of Zook's severe bipolar affective disorder and its effects, Zook will be unable to repay her loans in the foreseeable future.

C.

GOOD FAITH EFFORT TO REPAY

The final inquiry is whether the debtor has, in good faith, attempted to repay the loan. *See Polleys*, 356 F.3d at 1310; *Brunner*, 831 F.2d at 396. A debtor must show he or she has made reasonable efforts to maximize income and minimize expenses in order to repay the loan. *See Polleys*, 356 F.3d at 1309. A debtor cannot intentionally over-budget, recklessly spend, flippantly ignore the debt, or otherwise strategically attempt to claim a windfall by shirking responsibility for his or her loans. The court may also consider whether the debtor has tried to make some payments when he or she could, or has sought to defer the loan or renegotiate the repayment plan. *Cf. Brunner*, 831 F.2d at 397 (rejecting satisfaction of the good faith requirement because the debtor made no effort to first defer the loan payments while she was unemployed, and filed for discharge of the debt shortly

27

after she finished her education and prior to the first payment
being due).

Here, Zook has made good faith efforts both to repay her
loans and to minimize her budget.  Zook inherited $180,000 and,
although no payments were due at that time, paid back $30,000 of
her undergraduate student loans.  According to Zook's testimony,
she saved and invested the remaining money ($150,000) to pay for
medical school and provide for her cost of living during that
period.[6]  To minimize her budget, Zook stopped seeing her
occupational therapist, and went from seeing Dr. Cox once a week
to twice a month, in order to minimize her expenses.  There is
nothing in evidence which indicates that Zook is in any way
attempting to avoid repayment of her loans in bad faith.

Zook has not proceeded in bad faith in failing to agree to
an ICRP plan.  There is no per se rule that failure to agree to
an ICRP plan establishes bad faith. *See Educ. Credit Mgmt. Corp.
v. Mosley*, 494 F.3d 1320, 1327 (11th Cir. 2007); *Barrett v. Educ.
Credit Mgmt. Corp. (In re Barrett)*, 487 F.3d 353, 364 (6th Cir.
2007); *Tirch v. Pa. Higher Educ. Assistance Agency (In re Tirch)*,
409 F.3d 677, 682 (6th Cir. 2005).  Moreover, the ICRP is
"not always a viable option for debtors . . ., as it may require

---

[6]In addition to being used to pay for Zook's unsuccessful
attempts at completing medical school and living expenses, Zook
lost $20,000 investing in the stock market, and spent $20,000 to
pay for later hospitalization.

them effectively to 'trad[e] one nondischargeable debt for another' because any debt that is discharged under the program is treated as taxable income." *In re Mosley*, 494 F.3d at 1327 (quoting *In re Barrett*, 487 F.3d at 364).  Finally, Zook has demonstrated (as discussed with respect to future ability to pay in part IV(B), above), the ICRP would not work for her because it would understate her medical expense needs and her need to reserve for the practically inevitable periods of unemployment she will suffer due to her medical condition.

V

Having satisfied the three requirements of the *Brunner* standard, Zook has established that she would undergo an undue hardship were she compelled to repay her education loans.  As such, a judgment follows declaring that her student loans at issue in this adversary proceeding be discharged pursuant to 11 U.S.C. § 523(a)(8).

[Signed and dated above.]

Copies to:

All parties and counsel of record.